**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-02-36-F |
| | ) | |
| TONY DUONG, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER (INCLUDING
FINDINGS OF FACT AND CONCLUSIONS OF LAW)
WITH RESPECT TO MOTION UNDER 18 U.S.C. § 2255**

The court now states its ruling (including its findings of fact and conclusions of law) with respect to the defendant's motion to vacate under 28 U.S.C. § 2255.

I.      Summary of § 2255 Proceedings.

The defendant, Tony Duong, having been convicted in August, 2002, on one count charging distribution of pseudoephedrine knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance, and on three counts of money laundering (and having been acquitted on five other counts of money laundering), filed his motion under § 2255 on March 16, 2005 (doc. no. 104). The government responded to the motion on April 15, 2005 (doc. no. 109), and the defendant filed his reply to the government's response on May 23, 2005 (doc. no. 117).[1]

---

[1] The conviction was affirmed by the Court of Appeals by order and judgment dated December 19, 2003 (doc. no. 101).

In his motion, defendant advanced six specific grounds for relief, five of which come under the heading of denial of effective assistance of counsel and one of which asserts that the government unconstitutionally failed to disclose information exculpatory to Mr. Duong.

Defendant articulates his assertions of denial of effective assistance of counsel as follows:

1.  Denial of effective assistance of counsel based upon trial counsel's failure to effectively utilize the interpreter at trial.

2.  Denial of effective assistance of counsel based upon trial counsel's failure to call key witnesses and present exculpatory evidence at trial.

3.  Denial of effective assistance of counsel based upon trial counsel's failure to conduct an adequate pretrial investigation.

4.  Denial of effective assistance of counsel based upon trial counsel's failure to adequately cross examine the government's key witness in a competent manner.

5.  Denial of effective assistance of counsel, consisting of the cumulative errors of trial counsel throughout the trial.

*See* Motion, doc. no. 105, at I-ii.

Defendant's contention with respect to the asserted failure by the government to disclose exculpatory information is that the government breached its duty to disclose the identity of a confidential informant and failed to provide complete pretrial discovery, including discovery of exculpatory evidence.

After the court reviewed the motion, the response and the reply, the court concluded that the five claims of ineffective assistance of counsel should be resolved on the basis of an evidentiary hearing:

Having reviewed . . . all of the parties' submissions in support of and in opposition to the motion, and mindful that under section 2255, a hearing is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court concludes that an evidentiary hearing as to defendant's five claims of ineffective assistance of counsel is necessary. Defendant's claims of ineffective of assistance of counsel raise serious matters which should not be resolved without an evidentiary hearing.

July 5, 2005 Order, doc. no. 118. In the same order, the court set a scheduling conference for August 2, 2005 for the purpose of discussing scheduling, discovery and other matters relevant to the prompt and fair resolution of the issues presented by the motion. *Id.* A discovery conference was held on January 5, 2006, which facilitated amicable resolution of a number of discovery issues and enabled the court to resolve those issues as to which no agreement was reached, a resolution which was memorialized in the court's January 10, 2006 order (doc. no. 133). The January 10 order required the government to: (I) produce a written description of the efforts made by the U.S. Marshal's Service to apprehend Tan Do, (ii) provide copies of the discovery materials which would have been discoverable in the prosecution of Tan Do in the Eastern District of Louisiana (case no. CR-00-387 in that court), and (iii) provide a statement of the aliases of Mr. Do known to the United States Marshal's Service. *Id.* The January 10 order also addressed defendant's effort to obtain copies of reports and other materials relating to Larry Petit, his business enterprise (referred to as "OTC"), and his relationship with the government. *Id.,* pp. 4, 5.

As to the defendant's contentions with respect to Mr. Tan Do, the court noted that the defendant was at liberty to seek further discovery, if warranted, subsequent to the government's compliance with the court's January 6 order. *Id.* at 4. Likewise, with respect to production of the discovery materials from the Tan Do prosecution in the Eastern District of Louisiana, the court left open the possibility of further attention

3

to discovery of those materials in the event that difficulties arose as a result of any impairment of the capabilities of the relevant offices in the Eastern District of Louisiana. *Id.* at 5. Finally, with respect to the defendant's request for information relating to Mr. Petit, the court noted that nothing had been presented which would suggest that any information about Mr. Petit which was not produced by the government prior to the August, 2002 trial would have been discoverable either under Rule 16 of the Fed. R. Crim. P. or as <u>Brady</u> material. *Id.* at 6. The January 10 order stated, however, that if the threshold showing which had not been made should later be made, that could certainly be addressed by the court. *Id.*

The § 2255 motion came on for hearing on April 25, 2006. The defendant presented six witnesses. Those witnesses were Andrew Ta (an interpreter from California), Marlene Mai Ly Do (an interpreter from Oklahoma City), Nha Duong (defendant's brother), David Smith (defendant's trial counsel), Margaret Van Naerssen (an expert witness), and the defendant himself.

At the hearing, no evidence was presented with respect to points 2, 3 and 4 (and, by extension, point 5) of defendant's contentions with respect to denial of effective assistance of counsel, as enumerated on page 2, above. Save for some general examination of Mr. Smith as to his overall handling of his responsibilities as defendant's trial counsel, the evidence at the hearing was exclusively directed to point 1, the asserted denial of effective assistance of counsel based upon trial counsel's alleged failure to effectively utilize the interpreter at trial.

II.   <u>Findings of Fact</u>.

a.   <u>Procedural history of the criminal prosecution</u>.

The defendant was indicted on March 5, 2002 and was arraigned two days later.

On March 22, 2002, the court held a hearing for the purpose of addressing the withdrawal of defendant's original counsel and the substitution of Mr. Smith as his new counsel, and for the related purpose of determining an appropriate trial date.  At that hearing, the following discussion was had as to the defendant's need for an interpreter:

> [THE COURT:]  The totality of the circumstances do suggest to the Court that it would be appropriate to try this case in June as we have discussed.  That said, of course, certain matters must be established on the record in order to effect an appropriate and enforceable waiver of the Speedy Trial Act.
>
> And for that purpose, first of all, Mr. Sengel, what says the government as to whether Mr. Duong needs an interpreter? Do you have any position one way or the other on that?
>
> MR. SENGEL:  It's my understanding, Your Honor, he does not need an interpreter for these proceedings.
>
> THE COURT:  Mr. Smith, does Mr. Duong need an interpreter in order for the Court to have a colloquy here in open Court with Mr. Duong?
>
> MR. SMITH:  I don't believe so, Your Honor.  I believe he speaks and understanding the English language well.  I have advised him to speak slowly and try to speak clearly.  He does have an accent, but we have no concerns about whether he understands English properly.

March 22, 2002 tr. at 9-10.

On May 24, 2002, the matter was again before the court on the defendant's motion for a continuance of the trial and motion dates.  On that occasion, the court addressed the defendant's proficiency in the English language as follows:

> THE COURT:  Mr. Duong, forgive me for not remembering from our previous hearing the extent to which you understand English.  Do you understand English?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Smith, are you satisfied that your client understands English at least for the purposes of our colloquy today?

MR. SMITH:  I am, Your Honor.  And you'll note he has a heavy accent, but I believe he does understand English.

May 24, 2002 tr. at 4-5.

The jury trial began on August 13, 2002.  Although the court had had the opportunity to personally observe the defendant's English proficiency and although the court had, at that point, been assured twice by defendant's counsel that the defendant understood English, the court concluded that further attention to that matter would be appropriate.  For that reason, the court held a hearing in chambers, attended by the Assistant United States Attorneys, the defendant's counsel and the defendant.  At that in-camera proceeding, the following colloquy was had:

THE COURT:  The reason we're here - - and if at any time either proceeding in chambers like this or anything that I say or do is objectionable, either to the government or the defendant, I would certainly ask you to speak up.  At an earlier stage of this case we had an open court proceeding, I believe it related to a speedy trial act waiver.  I could be mistaken about that, but it was certainly an open court proceeding in which I had a colloquy with the defendant, and for those purposes on that day I was satisfied with the defendant's ability to understand what I was saying and understand what was going on and to express himself to the limited extent that it was necessary that day.  I think that proceeding was certainly different from trial and I think that the considerations that would go into the Court's evaluation of the defendant's English language ability in a trial context are decidedly different than in a more routine, less consequential context, such as a speedy trial waiver, not to say that that's not important, but that certainly is not as momentous in a case like this as is a jury trial.

I didn't want to have a conversation with Mr. Duong on that subject in open court.  I just didn't think that would be the setting that

would be optimal for a dialogue on that subject.  We do, as all counsel know, we do have interpreter services available.  I have made tentative arrangements to have an interpreter available and that is wholly separate from the interpreter for the witnesses.  This is an interpreter secured by the Court for the benefit of the defendant and would be a different person from the interpreter, if any is needed, for any of the witnesses.

But in order to put me in a bit of a better position to evaluate the need for the presence of an interpreter, even on a standby basis for the defendant, I wanted to have a short conversation with the defendant on matters totally unrelated to the facts of this case in order to give me a bit of a better comfort level in terms of the defendant's facility, if you will, with the English language.

That said, does the government or the defendant object, at least in principle, to my having a short conversation with the defendant for the stated purpose?

MR. SENGEL:  Government does not object, Your Honor.

MR. SMITH:  We don't object.

THE COURT:  Mr. Duong, as you know, my name is Stephen Friot, I'm the Judge in this case.  We are about to select a jury for your jury trial.  What do you expect will be happening today in your case?

THE DEFENDANT:  Can you say again?

THE COURT:  Sure.  Can you tell me what you think will be happening today in your case?

THE DEFENDANT:  I don't know.

THE COURT:  Okay.  Mr. Duong, can you tell me where you learned to speak English?

THE DEFENDANT:  I learn speak English from Indonesia camp when I stayed there for a few years.  I learned to speak English with

7

them and also when I comes in here, I learn from Southwest 74th and May.

THE COURT:  OCCC?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  What am I holding in my hand now?

THE DEFENDANT:  Susser (sic).

THE COURT:  Let the record show I'm holding scissors in my hand.

What do we do with these?

THE DEFENDANT:  Cut.

THE COURT:  Cut.  Okay.

What's in this picture?

THE DEFENDANT:  Boat.

THE COURT:  A boat.  Okay.  In light of the Court's questions, do counsel have any questions?

MR. SMITH:  No, sir.

MR. SENGEL:  Not from the government.

THE COURT:  Mr. Smith, on one hand, it's clear to me that Mr. Duong does have some ability with English.  Obviously, his ability to understand and his ability to speak may be two entirely different things with two entirely different levels of ability.  My inclination is, on the basis of what I perceive to be somewhat limited, although perhaps not painfully limited, but somewhat limited, ability with the English language, my inclination is to have an interpreter available for the

defendant and his counsel to use as they see fit and to the extent they see fit. What would be your thoughts on that, Mr. Smith?

MR. SMITH: We'd appreciate that, Your Honor. This is Mr. Duong's first time through this sort of process. I believe that he understands what we're doing, but the manner in which we speak in court and the manner in which we speak in the outside world are different quite often. My only real concerns are his ability to express himself in English and I may - - if he testifies it may be a problem for the court reporter and I may often - - in situations like this what we might do is if he gives an answer that may be a little unclear I may repeat it to him in good English and see if I could have a little bit of leeway in that regard. But we would appreciate having the interpreter present in case we get in over our heads in court terminology.

THE COURT: What does the government have to say?

MR. SENGEL: I agree. I would request an interpreter for Mr. Duong. I recognize, as you note, there was a difference between hearing and understanding and articulating, but given Mr. Duong has some difficulty in articulating the purpose of the proceeding today, I think it would be beneficial to him to have an interpreter.

THE COURT: Is an interpreter available today?

COURTROOM DEPUTY: I did not have one lined up for today.

THE COURT: Okay. We do have one ready to go for the actual evidentiary portion of the trial, but as Lori said, we don't have one lined up for jury selection. Mr. Smith, what are your thoughts on that?

MR. SMITH: I don't think that would be a problem, Your Honor. I think I can communicate with him sufficiently to get any feedback that he might have. And as you know, selection of the jury is mainly what the lawyers do anyway.

THE COURT: What the Court does.

MR. SMITH:  Well, yes, sir.  I'm reminded that the court is a lawyer also.

THE COURT:  Okay.  Well, we'll proceed on that basis.  When the actual evidentiary portion of the trial and opening statements begin, which I anticipate would either be very late this week or first of next week, we will have an interpreter available for the defendant and counsel to use to the extent that they consider to be appropriate.

That covers everything I needed to cover in chambers unless the government or defendant have anything else?

August 13, 2002 tr. at 2-7.

Having concluded that an interpreter should be provided for the defendant, the court appointed Mai Ly Do as an interpreter for the defendant under the provisions of the Criminal Justice Act, 18 U.S.C. § 3006A and the Court Interpreters Act, 28 U.S.C. § 1827.  Doc. no. 36.

Jury selection was completed on August 13, and the trial itself began on August 19, 2002.  At the trial, the court introduced the interpreter to the jury as follows:

[THE COURT:]  And ladies and gentlemen, we have a bit of an unusual situation here, not totally uncommon, but a bit of an unusual situation in that there may be a need for interpretive services both for the defendant and with respect to some of the witnesses, there may or may not be witnesses who need that service, but for that reason, we do have an interpreter here.  The proceedings in this Court must be made understood to all concerned, that's why we do have an interpreter.  That is such an important function that, just as you have been sworn, just as all the witnesses will be sworn, the clerk will now swear the interpreter.

(INTERPRETER SWORN.)

August 19, 2002 tr., at 3-4.

10

The interaction between the defendant and the interpreter during the trial is discussed in part B, below.

On September 11, 2002, a short time after completion of the trial, defendant's present counsel entered their appearance (doc. no. 63).  In late November, 2002, defendant filed a "Motion for Continuous Interpretation During Any and all Further Proceedings in this Court," doc. no. 81.  In this motion, defendant asserted that he was not highly proficient in English and "did not understand what was said throughout the majority of his trial."  Motion, at 3.  Accordingly, defendant concluded that:

> Defendant's lack of ability to speak and comprehend English, and the failure to have continuous interpretation at trial created a two-fold problem for Defendant.  First, Defendant did not understand the trial proceedings and did not have the ability to give meaningful assistance to counsel at trial.  Second, Defendant's poor spoken English was difficult to understand.  Even the court reporter, who spends her days listening to witness testimony and who has the ability to ask for clarification of testimony, had a difficult time understanding Defendant. If a court reporter had trouble understanding Defendant, one can only image the difficulty the jury faced in understanding Defendant.

*Id.*  On this basis, the defendant requested "that his court-appointed interpreter be allowed and/or ordered to conduct continuous interpretation, preferably simultaneous,[2] in any further proceedings before this court."  *Id.* at 6.

---

[2]  As interpreters' methods are commonly understood, simultaneous interpretation is, by definition, continuous:

> Generally, qualified court interpreters use three modes of interpretation: simultaneous, consecutive, or sight interpreting (translation).  A court interpreter may use the simultaneous mode of interpretation or the consecutive mode of interpretation, but should never use the summary mode of interpretation.  The simultaneous mode of interpretation is the preferred mode in judicial proceedings.  When using the simultaneous mode of interpretation, the interpreter is required to speak contemporaneously with the speaker.  This mode of interpreting is often used when the court interpreter is seated at counsel table assisting a non-English-speaking party.  When using the consecutive mode, the interpreter listens and speaks in a sequential manner

The motion for continuous interpretation was denied by order entered on December 5, 2002 (doc. no. 83), which stated, as relevant here, as follows:

> The judicial relief sought by the motion is unnecessary. At the trial of this case, an interpreter sat constantly at the side of the defendant, and her services were available to the defendant to whatever extent might have been deemed necessary by the defendant. The same will be true during all subsequent proceedings in this matter at which the defendant may be present. No court order is necessary to govern the extent to which the defendant avails himself of the interpretation services which have been made available to him by the court. The motion is accordingly **DENIED**.

Sentencing was held on January 21, 2003. At sentencing, the interpreter who had provided interpretation services at trial also provided those services at sentencing (without objection from the defendant). As noted by the court at the outset of the sentencing proceedings:

> THE COURT: Okay. And the Court will note that the interpreter present is the interpreter who was present throughout the trial. It is the Court's expectation that the interpreter will provide such translation or interpretation services for the defendant as may be requested as this matter proceeds, which may be requested either by the defendant or by defendant's counsel. And I believe that would be an adequate expression of the Court's expectation of the interpreter.

January 21, 2003 tr., at 2. At sentencing, defendant's counsel asserted that defendant's lack of proficiency with the English language was relevant to some of his

---

after the speaker has completed a thought. The speaker may pause at regular intervals to facilitate the conveyance of his or her statements through the interpreter. The consecutive mode of interpretation is often used during plea hearings or with witness testimony. Sight interpreting, or translation, occurs when the interpreter orally converts a document written in one language to a different language. The trier of fact hears the interpreter's rendition in English.

Grabau and Gibbons, *Protecting the Rights of Linguistic Minorities: Challenges to Court Interpretation*, 30 New Eng. L. Rev. 227, 281 (1966).

objections to the presentence report.  *Id.* at 11-13.  After hearing an extensive proffer from the defendant, the court addressed the language issues as follows at sentencing:

> [THE COURT:] I think it would be appropriate before we proceed further for the Court to make some findings on the language comprehension issue.  That was a concern of mine before trial.  As I recall, the defendant appeared before the Court before trial, sometime before trial, as I recall that may have been in connection with the Speedy Trial Act waiver.  Am I recalling that correctly, Mr. Williams?
>
> MR. WILLIAMS:  Yes, Your Honor, I believe that's correct, there was also a short colloquy before trial itself.
>
> THE COURT:  Well, beginning some time before trial, that dialogue, I was certainly sufficiently satisfied with the defendant's ability to understand and comprehend the English language and to speak the English language, to proceed with the Speedy Trial Act waiver, which, as I recall, that's what it was, although the record will correct me if I'm wrong.  As important as a Speedy Trial Act waiver is, it's still certainly pales in comparison to the importance of a trial, which, by any standards is a very momentous event in the life of any federal criminal defendant.  For that reason, as the trial approached, I continued to have some concerns with respect the defendant's ability to understand and speak the English language.  I elected to have counsel and the defendant into my chambers at the very beginning of the trial for what was, certainly by any standards, a very primitive, and I'm sure by any professional standard, a very cursory and primitive test.  I was frankly impressed with what - - as short as that test was, I was in some ways impressed with the defendant's ability to immediately respond to my questions and to respond appropriately to my questions, but I was still left with some misgivings about the defendant's ability to understand and speak English on a minute-to-minute basis as is required during trial.  For that reason, I determined that the defendant should be provided with an interpreter, he was provided with an interpreter.  The interpreter is one who has served this Court very ably over a number of years throughout a number of seriously contested and in some ways complex proceedings.  The interpreter was constantly at the table, was constantly available to the defendant.  And to the Court's observation, and I believe it is entirely appropriate for the Court to make observations as to matters which

occurred within the four corners of the courtroom, to the Court's observation, did attentively serve the defendant as often as and as constantly as was required by the defendant or his counsel.

The defendant was certainly attentive during the trial. There were substantial passages of the trial to my recollection in which the defendant sat and listened to the testimony and seemed certainly to be comprehending the testimony without the aid of the interpreter, and then there were some passages in which the defendant sought and received the aid of the interpreter, all of which was a matter entirely within the discretion of the defendant and his counsel.

The defendant testified on direct and then cross and then redirect. His answers on direct were responsive, his answers on direct, in the main, showed the Court that he understood what was being asked and he was able to express himself by way of answer. With respect, as an example, to the question and answer on page 403 that I read, where the question that was put was beginning at page 403 line 9.

"QUESTION:  Do you understand what you are charged with? Do you understand that the government says that you sold this pseudoephedrine and you should have known that it was going to go to manufacturing methamphetamine?

"ANSWER:  No."

Well, that is a slip-up that a perfectly fluent, literate person could make, when on one hand a criminal charge is being described and on the other hand, within the same question, the witness is being asked do you understand that this is what is alleged. The natural thing to do is say no when actually what's being asked is, does he understand. So, as I say, that is a slip-up that a perfectly fluent and literate person could make. So he gave, in the main, perfectly appropriate responsive answers on direct.

As might be expected, it was a little tougher go on cross, that is inherent in the nature of cross-examination. The defendant resorted more frequently to the interpreter on cross-examination, and I think that was entirely appropriate. It was the Court's duty to, for lack of a better word, to regulate the proceedings on cross-examination to see to it that

the pace was of one which both the defendant and the interpreter and the Court and jury could deal with and to ensure that the potential for misunderstanding was minimized.

I think the record will show that the Court made efforts to control the pace and otherwise to regulate the course of cross-examination so that it would not become unfair or oppressive to the defendant, and most importantly, so that it would not become a field for misunderstanding. Within the bounds of human ability, and I refer now to the human ability of the defendant and the interpreter and the jury and the Court, it is my finding, with which I am very contented, that the defendant showed by his verbal conduct and by his demeanor that, first of all, that he understood the essentials of what was taking place and to the extent that because of the circumstances, namely the words used or by whom the words were being used, for instance, on cross-examination, which is certainly a higher stress situation than direct, he demonstrated to the Court that he had a fundamental - - at a minimum, a fundamental understanding of what was taking place.  And to the extent that difficulties were encountered, he had available the services of a highly competent interpreter who performed her function admirably in this case as she has in numerous other cases in this court.  There is also a matter which was referred to in some papers filed some time ago of construction noise.  The transcript will show at least one juncture and probably more during the trial at which the Court halted proceedings so that the construction noise could be eliminated.  I considered that to be especially important in this trial, although it goes without saying that it is extremely important in any trial that we not be interfered with by noises from outside the courtroom.  I was especially sensitive to the construction noise during this trial and for that reason, I made certain that as soon as any construction noise got to the point that it could conceivably interfere with the ability of anyone in the courtroom to follow what was taking place, that the construction noise was stopped.  And as I recall, there was one time that Lori and I left the courtroom with everyone remaining here in the courtroom to go find the source of the noise and put an end to the noise.  There simply was no juncture during the trial during which the construction noise was permitted to interfere with the ability of anyone in the courtroom to hear what was going on.  It was not permitted to get that far.

15

And for that reason, although the Defendant's Exhibit Number 1 is received as an offer of proof and although I'm sure the work shown by Defendant's Exhibit Number 1 is impressive, the Court's observations of the defendant during the trial and ultimately the Court's provision of highly competent interpretive services, in the mind of this Court, and bearing in mind the ultimate obligation of fairness to a defendant who finds himself in this situation, leads the Court to the conclusion that the language barrier was surmounted in this trial, and I assure all concerned that I would not hesitate to require the defendant [sic] to conduct the trial again if I thought that there was any substantial likelihood that the language barrier was not surmounted during this trial.

*Id.* at 27-32.

     b.   The defendant's comprehension of the proceedings at trial.

The defendant's presentation at the evidentiary hearing which was held on April 25, 2006 was focused on his contention that his understanding of the proceedings at trial was insufficient to enable him to participate meaningfully in his own defense – resulting, he asserts, in the unconstitutional denial of effective assistance of his retained counsel.

It is not necessary that a criminal defendant have even slight understanding of the language in which the trial is being conducted. What is necessary is that, with the aid of an interpreter, if necessary, he have an understanding of the trial proceedings sufficient to enable him to comprehend what is taking place and to participate meaningfully in his defense. On this point, defendant's principal contention is twofold. Defendant asserts, first, that his English proficiency was so poor as to render him unable to understand the proceedings without the aid of an interpreter, and, second, that because the interpreter did not provide continuous interpretation, defendant was unable, even with the aid rendered by the interpreter, to understand the proceedings or to participate meaningfully in his own defense. As an adjunct to those contentions, the defendant further asserts that, because his trial testimony on direct

16

and cross examination was not given through an interpreter, he was unable to communicate effectively with the jury and thus was deprived of effective assistance of counsel.

At the criminal jury trial which was held in August, 2002, the defendant was, at the direction of the court, provided with the assistance of an interpreter. The concerns that led to the appointment of an interpreter are described above. Although Mr. Duong had been a resident of the United States for more than twenty-five years at the time of the jury trial, English is his second language; he is more at ease speaking and hearing Vietnamese.

The interpreter was Marlene Mai Ly Do. As is noted on page 10, above, with respect to the proceedings on August 13, 2002, the court appointed the interpreter so that an interpreter would be "available for the defendant and counsel to use to the extent that they considered to be appropriate." The interpreter, Ms. Do, is a freelance interpreter for Language Associates. At the time of the hearing on the § 2255 motion in April, 2006, Ms. Do had been affiliated with Language Associates for approximately 18 years. Although she is not certified as an interpreter, she has provided interpretation services in numerous cases, including approximately six federal jury trials and at least a dozen state jury trials.

Ms. Do is a native of Vietnam, having left Vietnam on April 30, 1975 at the age of 15. She has a degree in business management and computer science from Central State University in Edmond, Oklahoma. In addition to her in-court work, Ms. Do has worked directly with attorneys and law firms. Her spoken English is reasonably fluent, and she very clearly has an excellent ability to understand spoken English.

At the August, 2002 trial, Ms. Do sat next to the defendant. All of her conversations with the defendant were in Vietnamese. Her instructions from the defendant's counsel, David Smith, were to translate for the defendant to the extent

necessary.  During the trial, Mr. Smith and the defendant had no conversations about any interpretation problems.

Ms. Do was a highly credible witness.  By Ms. Do's account, when the trial testimony started, she started interpreting for the defendant.  After that, the working relationship between Ms. Do and the defendant evolved to the point that the defendant would signal Ms. Do to start and stop her interpretation, as determined by the defendant.  By Ms. Do's account, which is not contradicted or otherwise cast into doubt by any other testimony, Ms. Do interpreted for the defendant whenever he asked her to do so.  Ms. Do explained that it is not unusual to interpret intermittently and that continuous interpretation can be disturbing.[3]

When the defendant was on the witness stand, Ms. Do stood next to him, providing interpretation services to the defendant as and to the extent he indicated to her that he needed those services.  It was clear to Ms. Do that Mr. Duong understood what was taking place at the trial.  During the recesses in the trial, defendant and his attorney, Mr. Smith, communicated with each other without Ms. Do's services.

The defendant's account of the basis upon which Ms. Do's services were available was consistent with the testimony of Mr. Smith and Ms. Do (and was also consistent with the court's stated expectation, as discussed on August 13 (see p. 10, above)).  By defendant's account, the interpreter was there so that he could "ask [] her what I did not understand."  Tr. 161.

At the hearing on the present motion, the defendant made one assertion which deserves discussion.  Defendant testified that, at the August, 2002 trial, he did not ask the interpreter for help when he needed it because he felt awkward and the interpreter

---

[3]At the April, 2006 hearing, "interpret," in its various forms, was used interchangeably with "translate," in its various forms.  At the hearing, it was established that, for spoken language, the preferred term is "interpret," rather than "translate."  Tr. 119.

told the defendant that he could understand what was taking place. This characterization of Ms. Do's approach to her services to the defendant (and to the court) as an interpreter is distinctly at odds with the court's perception of Ms. Do's attitude toward her important work. However, if, in fact, Ms. Do told defendant that he was indeed able to understand the proceedings, that would not have been an erroneous observation. The court finds that, even without the aid of an interpreter, Mr. Duong was substantially able to understand the trial proceedings. This finding is not significantly undermined by the testimony of one of defendant's expert witnesses, Andy Ta. Testifying on the basis of a single telephone conversation[4] with the defendant and with a legal assistant, Mr. Ta opined that defendant definitely needed the assistance of a professional interpreter at the trial of this case. Mr. Ta also opined that, with simultaneous interpretation (as distinguished from consecutive interpretation, in which the interpretation, in essence, comes in short bursts), the defendant would have been more able to assist in his defense. Mr. Ta provided no explanation for this observation. It should also be noted that Mr. Ta testified at the April, 2006 hearing without having read the transcript of the jury trial.[5]

Defendant's trial counsel, David Smith, provided useful and persuasive insights into the defendant's ability to understand the proceedings at the jury trial. In Mr. Smith's meetings with his the defendant before trial, it did not appear to Mr. Smith that the defendant had difficulty communicating verbally. At these meetings, Mr. Smith discussed the case with his client, discussed what might happen at trial, and discussed some specific items from the voluminous discovery materials which were

---

[4] Tr. 13, 14, 16, 23.

[5] It should, of course, be borne in mind that, even if Mr. Ta's testimony is credited in its entirety, the defendant did continuously have the services of an interpreter at trial.

provided by the government.  Mr. Smith also discussed with the defendant the anticipated topics of direct examination.

As has been noted, during the trial, Mr. Smith and the defendant had no conversations about problems with interpretive services.  In planning for the direct examination of defendant, Mr. Smith was concerned that the use of the interpreter throughout the direct examination would amount to interposing a buffer between the defendant and the jury.

Taking into account the testimony of the defendant, his attorney and his trial interpreter, the court is substantially unmoved by the expert testimony which the defendant offered through Professor Margaret Van Naerssen.

Professor Van Naerssen's assignment, from defendant's present counsel, was to review the transcript of the jury trial and determine the degree to which the defendant experienced communication difficulties at that trial, as well as to determine the limitations on his ability to defend himself based on the evaluation of his English language proficiency which was conducted by individuals associated with the University of Oklahoma.

Professor Van Naerssen's testimony must be evaluated in light of the fact that she had never spoken to the defendant, had never spoken to his trial counsel, David Smith, had not heard any audiotapes from the trial, had not had any conversations with the trial interpreter, and had not had any conversation with the defendant's family members.  It appears that the factual foundation for Professor Van Naerssen's review consisted entirely of her review of the trial transcript and the report of the University of Oklahoma evaluation.  On this basis, Professor Van Naerssen concluded that the defendant would have had a difficult time participating effectively in his own defense.

Professor Van Naerssen was critical of the fact that the defendant was not provided with a continuous translation of the trial proceedings and opined further that,

due to his lack of proficiency in English, the defendant would have had a difficult time telling his story on direct examination.  On this latter point, the use of simultaneous interpretation during the direct examination of the defendant at the April, 2006 hearing was telling.[6]   When defendant testified at the April, 2006 hearing, his testimony was presented directly and virtually entirely through an interpreter, using simultaneous interpretation.  The interpreter stood next to the defendant and repeated to him, in Vietnamese, the content of questions which were being put to him in English.  This simultaneous interpretation during the direct and cross examination of the defendant at the April, 2006 hearing provided a dramatic example of one of the "costs" (to use Dr. Van Naerssen's term) of simultaneous interpretation.  Mr. Ta, the interpreter who (in addition to serving as an expert witness) interpreted for defendant at the April, 2006 hearing is, without doubt, a very proficient interpreter.  However, his interpretation of counsel's questions, occurring *while the questions were being asked by counsel,* was highly distracting, with the result that great concentration was required in order to hear and comprehend the questions that were being asked.  This, of course, does not suggest that simultaneous interpretation would have been inadvisable when defendant was seated at the counsel table listening to the proceedings, but the experience described above is quite sufficient to persuade the court that simultaneous interpretation while the defendant was on the witness stand would hardly have been an improvement over the method by which defendant's testimony was presented at the jury trial.

---

[6] Lest there be any confusion as to the scope of defendant's criticism of his trial counsel's use of the interpreter at trial, defendant's moving papers make it clear that he now contends that simultaneous interpretation should have employed both while he was at the counsel table (Motion, doc. no. 105, at at 20 - 21) and on the witness stand (*id.* at 22).

In his testimony[7] at the jury trial, defendant used the interpreter as needed. In most instances, defendant responded to questions without using the interpreter either to receive the question or to convey his answer. In some instances, he resorted to the interpreter, doing so at his own instance. The presentation of defendant's testimony required careful attention and some patience.[8]

On the subject of "occasional translation" (as Dr. Van Naerssen called it - tr. 115), Dr. Van Naerssen testified that, if it is necessary for the recipient of the interpretative services to ask for assistance in the middle of a series of questions, the flow of communication is broken, and the interpreter may also miss significant statements. Accordingly, Dr. Van Naerssen opined that simultaneous interpretation would have enabled defendant to understand the proceedings better than he did.

Because of the limitations, which have been noted, on the factual basis for their opinion testimony, the ability of Mr. Ta and Dr. Van Naerssen to reliably and persuasively assess and critique the interpretative services provided by Ms. Do is very limited – limited, especially, by the fact that neither Mr. Ta or Dr. Van Naerssen had the opportunity to personally observe the interaction between Ms. Do and the defendant. The court's ability to credit Dr. Van Naerssen's testimony was also significantly affected by the fact that she was noticeably evasive in a number of instances on cross examination.

The fact that Ms. Do did not provide (and was not requested or directed to provide) continuous interpretation at the jury trial did not significantly affect the defendant's ability to comprehend the proceedings or to assist meaningfully in his

---

[7] Defendant testified because he chose to do so. The normal practice of defendant's trial counsel was to explain to his client that he did not have to testify if he did not want to do so. Tr. 86.

[8] Construction noise in the courthouse did not impair the presentation of defendant's testimony or any other aspect of the trial. The court took the action necessary to avoid any adverse effects from the few brief instances in which construction noise could be heard in the courtroom.

defense.  When witnesses other than defendant were testifying (or when other matters were being addressed by the court), Ms. Do provided interpretation as needed and requested by defendant.  Likewise, when defendant was on the stand, Ms. Do's assistance was rendered as necessary to facilitate defendant's communication with the jury.  To be sure, Mr. Duong was unable to address the jury as fluently as if he were a native English speaker.  His testimony was slow and halting at times, but the effect of those interruptions pales in comparison to the "cost" of using the interpreter to translate every question and every answer.

       c.     <u>Other factual matters</u>.

The defendant's § 2255 motion asserted the following bases for relief in addition to his contentions with respect to deficiencies in the services of the interpreter:

1.     Denial of effective assistance of counsel based upon trial counsel's failure to call key witnesses and present exculpatory evidence at trial.

2.     Denial of effective assistance of counsel based upon trial counsel's failure to conduct an adequate pretrial investigation.

3.     Denial of effective assistance of counsel based upon trial counsel's failure to adequately cross examine the government's key witness in a competent manner.

4.     Denial of effective assistance of counsel, consisting of the cumulative errors of trial counsel throughout the trial.

The court's July 5, 2005 order made it clear that defendant's five claims of ineffective assistance of counsel would be resolved on the basis of an evidentiary hearing.  ("[T]he court concludes that an evidentiary hearing as to defendant's five claims of ineffective assistance of counsel is necessary."  Doc. 118, at 1.)  To that end, as set forth in the court's January 10, 2006 order, the court provided the

defendant with the access to discovery to which he was entitled.  But at the April 25, 2006 hearing, no evidence of any significance was presented on any issues other than the issues with respect to the interpreter.  Defendant's present counsel briefly inquired of Mr. Smith as to trial preparation and related matters (Tr. 77 - 79, 81), but nothing was presented at the April 25 hearing that raised any serious issues as to any matters other than those addressed in parts II (a) and (b), above.[9]  As to the four additional contentions listed above, there is an entire failure of proof.

III.    Conclusions of Law

As is summarized on page 2, above, the defendant asserts four bases (and, as a fifth basis, the cumulative effect of the first four) upon which he was denied effective assistance of counsel.  As has been noted, the focal point of the hearing was defendant's assertion that he was denied "effective assistance of counsel based upon trial counsel's failure to effectively utilize the interpreter at trial."  Motion, doc. no. 105, at 19.

---

[9]  As an example, defendant attached an affidavit from J. Nelson  Bonifield to his Reply in support of his § 2255 motion (Exhibit 4 to doc. no. 117).  He then asserted, in his proposed findings, that Mr. Smith rendered ineffective assistance in failing to call Mr. Bonifield (among other witnesses) at the jury trial.  Doc. 148, at 9.  Defendant also advances a cursory argument as to the failure of Mr. Smith to call  Hieu Nguyen and Joe Whatley at trial.  Doc. 148, at 9 - 10; doc. 149 at 25 - 27.  But at the April 25 hearing, Mr. Bonifield was not mentioned a single time.  The first mention of Mr. Whatley was in the *government's* cross examination of Mr. Smith.  Tr. 88.  The *only* mention of Mr. Nguyen was by the government.  Tr. 88.  These fleeting references in the evidence and in the post-trial filings fall far short of a showing that, as a result of these asserted failings (individually or in combination with the contentions as to the interpreter), Mr. Smith's services fell below an objective standard of reasonableness or that there is a reasonable probability that, but for these matters, the result of the trial would have been different.  Similarly, defendant averred in an affidavit that Mr. Smith smelled of alcohol when he and the defendant  met in the evening during the trial  (which, if true, would  be far from the first time a trial lawyer had a drink after a day of trial).  But Mr. Duong's testimony at the April 25 hearing was silent on that score, and the only mention of the subject occurred when the government asked questions of Mr. Smith on cross.  Tr. 93.  There is no evidence that Mr. Smith was ever impaired, even slightly, at any time between the beginning and the end of the jury trial.

Defendant's contentions with respect to the use of the interpreter at trial are advanced as a species of ineffective assistance of counsel.  The theory is, in essence, that Mr. Smith should have seen to it that Mr. Duong had the benefit of continuous interpretation services, provided by a competent interpreter, throughout the trial.  *See* Motion, doc. no. 105, at 19 - 22.  Because defendant's arguments with respect to the interpreter are advanced under the heading of ineffective assistance of counsel, the court must, as a preliminary matter, identify the controlling body of law.

Ineffective assistance of counsel.  Ineffective assistance of counsel is established when it is shown that the representation provided by trial counsel fell below an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Relief may be granted where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  The burden of proof on these elements lies with the defendant.  *Id.  See also*, United States v. Magleby, 420 F.3d 1136, at 1139-40 (10th Cir. 2005).

Inadequate interpretation.  The Tenth Circuit has not, in terms, established a standard to be applied in determining whether habeas relief should be granted as a result of allegedly deficient interpretation services.  As will be seen, there are some relevant Tenth Circuit decisions, but none which directly address that point.  Consequently, the court turns to decisions from other circuits for guidance.  As is set forth in an illuminating discussion in Negron v. State of New York, 434 F.2d 386, at 389 (2d Cir. 1970), a number of vitally important trial-related rights are implicated when, as a result of language difficulties, the trial proceedings are not fully understandable to the defendant.

In federal criminal prosecutions, issues as to the adequacy of interpretation services are evaluated both under statutory law and constitutional law. The statutory law is the Court Interpreters Act of 1978, 28 U.S.C. § 1827. Under § 1827(d), the court is required to appoint an interpreter if the court determines that the defendant or a witness "speaks only or primarily a language other than the English language . . . so as to inhibit [the defendant's] comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony." 28 U.S.C. § 1827(d). *See, generally*, United States v. Black, 369 F.3d 1171, 1174 - 76 (10th Cir. 2004), *cert. denied*, 543 U.S. 937. Thus, § 1827 speaks to the needs of witnesses as well as litigants. In this case, the defendant was both a litigant and a witness at the jury trial.

If an interpreter is required, the interpreter shall be "the most available certified interpreter" or, when no certified interpreter is reasonably available, the interpreter shall be "an otherwise competent interpreter." 28 U.S.C. § 1827 (d). An interpreter is "certified" within the meaning of § 1827 if she has been certified by the Director of the Administrative Office of the United States Courts. *See* § 1827(b)(1). Ms. Do did not have certification from the Director of the Administrative Office. The court was of the opinion at the time Ms. Do was appointed to serve as an interpreter for the trial of Tony Duong, and concludes once again in this order, that Ms. Do was "otherwise qualified" within the meaning of 28 U.S.C. § 1827(d)(1).[10]

Under the Court Interpreters Act, the issue which must be resolved where no interpreter has been provided, or where it is asserted that the interpretation services

---

[10] The court is informed by the clerk of court that, at the time of Mr. Duong's jury trial, an AO-certified Vietnamese interpreter was not available in this district.

were inadequate, is whether the absence or inadequacy of the interpreter "made the trial fundamentally unfair." *See*, United States v. Tapia, 631 F.2d 1207, 1210 (5th Cir. 1980); Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989) (per Powell, associate justice (Ret.) (quoting Tapia in a case in which continuous translation may not have been provided)); United States v. Joshi, 896 F.2d 1303, 1309 (11th Cir. 1990) ("fundamentally unfair," citing Valladares and Tapia); and United States v. Huang, 960 F.2d 1128, 1135-36 (2nd Cir. 1992) ("fundamentally unfair," citing Joshi and Valladares).

Where a criminal defendant cannot understand English at all, complete and continuous interpretation is especially important. *E.g.*, Negron, 434 F.2d at 388.

Claims that trial interpretation was constitutionally inadequate under the Fifth and Sixth Amendments "are subject to a similar standard." Valladares, 871 F.2d at 1566. The court "must balance the defendant's rights to confrontation and effective assistance against the public's interest in the economical administration of criminal law." *Id.* There is no constitutional right to flawless, word for word interpretation – the issue remains whether the asserted inadequacies in the interpreter's services rendered the trial fundamentally unfair. United States v. Gomez, 908 F.2d 809, 811 (11th Cir. 1990), *cert. denied*, 498 U.S. 1035.

The standard applicable under the Court Interpreters Act interlocks with the requirements of the Fifth and Sixth Amendments in that "the purpose of the Act is to mandate the appointment of interpreters under certain conditions and to establish statutory guidance for the use of translators in order to insure that the quality of the translation does not fall below a constitutionally permissible threshold." Joshi, 896 F.2d at 1309.

In the case at bar, it is, without doubt, significant that the defendant did have substantial ability to speak and understand English. Outside of court, he transacted

business in English (as well as in Vietnamese).  In court, he spoke English and responded to numerous questions which were put to him only in English.  Thus, this is not a case in which, due to a complete inability to speak or understand English, the defendant may as well have been deaf as he sat at the counsel table.

In applying the relevant standards, the court's analysis is driven predominantly by the following facts: (I) the defendant had some ability to speak and understand English, (ii) his facility with the English language clearly did not put him on the same footing as a native English speaker, and (iii) during the jury trial, neither the defendant nor his counsel (nor the interpreter) gave any verbal or nonverbal indication that the defendant was having any difficulty comprehending the proceedings or that his ability to express himself as a witness was impaired to a degree beyond that which was clearly evident from the interaction between the defendant, the interpreter, defendant's counsel, and the Assistant United States Attorney.  On this last point, failure to bring any difficulties to the attention of the court, it should be borne in mind that both the defendant and his counsel were unquestionably aware of the court's consciousness of the need to address language-related issues (*see* pp. 5 - 11, above).

Thus, assuming that the "general standard for the adequate translation of trial proceedings requires continuous word for word translation of everything relating to the trial," Joshi, 896 F.2d at 1309, the court must nevertheless apply the relevant standards in light of the English language ability the defendant *did have* and the contemporaneous objections that he *did not make*. *Id.*  That said, the court is also mindful of the fact that the failure to make "specific, contemporaneous objections" to inadequacy of interpretation will not foreclose a later challenge.  United States v. Urena, 27 F.3d 1487, at 1491 (10th Cir. 1994), *cert. denied* 513 U.S. 977.  *But cf.* Justice Powell's cautionary words in Valladares, 871 F.2d at 1566 ("To allow a

defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.").

If the services of the interpreter departed from the continuous interpretation standard:

> then the court should inquire whether such failure inhibited [the defendant's] comprehension of the proceedings or whether such failure prevented him from assisting his counsel in cross-examination of witnesses that he claims did not testify to the truth. It might be that although his primary language is [Vietnamese], his understanding of the English language is such that he was not inhibited from comprehending the proceedings and the presentation of the testimony of the witnesses against him.

Tapia, 631 F.2d at 1210.

These authorities, helpful though they are, do nothing more than require the court to return to the question of whether the intermittent interpretative services in this case, viewed in conjunction with the English language ability the defendant did have and the objections which he and his lawyer did not make, establish that the trial was "fundamentally unfair." The court concludes, as a factual matter and as a legal matter, that the jury trial of defendant Tony Duong was not rendered fundamentally unfair as a result of any inadequacy with respect to the competence of the interpreter, or with respect to the efficacy of the services she rendered, or with respect to trial counsel's judgments as to the best ways to use the services of the interpreter who was appointed by the court to serve the defendant.

A failure to provide continuous interpretation does not mandate habeas relief. Valladares, 871 F.2d at 1566. "Rather, where continuous translation may not have been provided, the reviewing court must determine whether the purposes of the [Court Interpreters Act] were adequately met" and whether "the

29

trial [was] fundamentally unfair." <u>Valladares,</u> at 1566 (internal quotation marks and citations omitted). As Judge Tacha concisely wrote: "The role of a translator, after all, is to bridge any language gap which might exist."

In the case at bar, the court confidently concludes that the interpreter, Mai Ly Do, did indeed bridge the language gap that existed to the extent that her services were necessary to accomplish that important objective. Viewing the matter under the constitutional and statutory standards applicable where adequacy of interpretation is challenged, the court concludes that the trial interpretation services in this case were neither constitutionally nor statutorily inadequate. Viewing the matter through the prism of <u>Strickland</u> and its progeny, as advocated by defendant, the court concludes that the performance of Mr. Smith did not fall below an objective standard of reasonableness and that even if Mr. Smith's performance fell below that standard, the defendant has not carried his burden of establishing that, absent the asserted errors, the result of the proceeding would have been different.

<u>Other claims</u>. As has been noted (*see* pp. 24 - 25, above), defendant's claims other than those with respect to adequacy of interpretation were effectively abandoned at the April 25 hearing. As is discussed on pages 3 and 24, above, this court determined, early on, that the defendant's assertion of ineffective assistance of counsel would be resolved with the benefit of an evidentiary hearing. The affidavits which were submitted with defendant's original memorandum in support of his § 2255 motion (doc. no. 105) "assist[ed] in formulating issues of fact," <u>Sciberras v. United States</u>, 404 F.2d 247, 250 (10th Cir. 1968), but, due to the sharp controversy as to the facts which would control the outcome of this § 2255 proceeding, the court's conclusion, early in the § 2255 proceedings, was that this case would not be tried on paper. *See,*

*e.g.*, <u>Reed v. United States</u>, 438 F.2d 1154, 1155-56 (10th Cir. 1971).[11]  The court, having determined that an evidentiary hearing was necessary (*see* Rule 8(a), Rules for Section 2255 Proceedings), applied at the hearing and applies in this order the Federal Rules of Evidence.  *See* Rule 1101(e), F. R. Evid.  The affidavits submitted by the defendant are inadmissible hearsay.  Rule 801, F. R. Evid.  Moreover, to the extent that the affidavits proffered by the defendant address matters, relating to adequacy of interpretation or otherwise, which were not presented at the April 25 hearing, those affidavits, even if admitted in evidence, would leave the court unpersuaded that defendant received ineffective assistance of counsel at trial or is otherwise entitled to relief under § 2255.

Defendant's Motion to Vacate, Set Aside or Correct his Sentence Pursuant to 28 U.S.C. § 2255 is in all respects **DENIED**.

DATED October 16, 2006.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

02-0036p044(pub).wpd

---

[11]  *See also*, 28 U.S.C. § 2246, which states:

On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit.  If affidavits are admitted any party shall have the right to propound written interrogatories to the affiants, or to file answering affidavits.